IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ARMAMENT SYSTEMS AND PROCEDURES, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civ. Action No. 00-C-1257 |
| vs. | ) |
| | ) Judge William C. Griesbach |
| IQ HONG KONG LIMITED, et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE ERICH SPECKIN,
DEFENDANT'S PURPORTED FORENSIC DOCUMENT EXPERT**

Pursuant to Fed. R. Evid. 104(a), 402, 403 and 702 Plaintiff Armament Systems & Procedures ("ASP") respectfully moves *in limine* to exclude the testimony and expert report of Erich Speckin, Defendants' purported expert in the area of forensic document analysis.

Mr. Speckin does not have the qualifications necessary to be considered an expert. He has no formal degree in forensic analysis and has not been certified by either of the leading forensic societies.

> Q: "Where did you get the title [forensic document analyst]?"
> A: "From my father"

*Deposition of E. Speckin*, at 149:4-5 (**Ex. A**).

Mr. Speckin's opinion is not based on reliable scientific methodology. Instead, Mr. Speckin makes a number of conclusions based wholly on unsupported assumptions.

Mr. Speckin ignored and did not report objective evidence that contradicts his opinions.

Mr. Speckin's expert credentials, objectivity and the reliability of findings have been questioned and his testimony barred in several other proceedings. *EEOC v. Ethan Allen, Inc.*, 259 F. Supp. 2d 625, 634-639 (N.D. Ohio 2003) ("[I]t is clear that the **Court must close the**

gate to Speckin's proposed expert testimony, because it is **not "the product of reliable principles and methods."**) (emphasis added, citing Fed. R. Evid. 702); *Adrian v. Lafler*, 299 F. Supp. 2d 754, 758 (E.D. Mich. 2004) (noting that Mr. Speckin's credentials were sufficiently challenged during the state court criminal trial "such that the **trial judge indicated regret at qualifying him as an** expert.") (emphasis added); *Aptix Corp. v. Quickturn Design Sys., Inc.*, 2000 WL 852813 at *19 (N.D. Cal. June 14, 2000), *aff'd in pertinent part*, 269 F.3d 1369 (Fed. Cir. 2001) ("The Court **will not place any reliance on the results of Expert Speckin's** 'relative ink-date testing," also known as "accelerated aging.") (emphasis added); *In re Estate Wang Teh Huei*, 2002 WL 1341762, at P29.31(f) (Hong Kong Special Administrative Region Ct. of First Instance) (Nov. 21, 2002) (commenting on its belief that **Speckin "tailored his results to suit his client's requirements"** and finding that **"[Speckin's] credibility falls far short of the high standards of integrity which one would expect from an expert**…" (emphasis added)) (**Ex. B**). Mr. Speckin's opinion and testimony should be excluded here as well.

## DISCUSSION

The "forensic" evidence relied upon by the defendants was not procured by a qualified expert and was not the result of scientific testing. The conclusions, without scientific support, are conveniently tailored to suit defendants' arguments. Consequently, Mr. Speckin's report and testimony should be excluded under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

**I.     The Standards for Admission Under Federal Rule of Evidence 702 and *Daubert*.**

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct.

2786 (1993). *See Smith v. Ford Motor Co.*, 215 F.3d 713, 717-18 (7th Cir. 2000). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony bears the burden of establishing its admissibility. *Bradley v. Brown*, 852 F.Supp. 690, 697 (N.D. Ind. 1994), *aff'd*, 42 F.3d 434 (7th Cir. 1994).

In *Daubert*, the Court directed trial judges to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and or whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The Court held that the factors to be considered are: (1) whether the theory relied on by the witness "can be (and has been) tested," *id.* at 593; (2) whether "the theory or technique has been subjected to peer review and publication," *id.*; (3) "the known or potential rate of error," *id.* at 594; and (4) the "'degree of acceptance'" of the theory in the scientific community, *id.* (internal citation omitted).

The basic task of the district court with regard to analyzing reliability is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert used in reaching his conclusion. *Dartey v. Ford Motor Co.*, 104 F.Supp.2d 1017, 1021-22 (N.D. Ind. 2000) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153, 119 S.Ct. 1167, 1176-77 (1999)). When examining the expert's methodology, the court should evaluate the factual basis, data, principles, methods, and their application, in order to determine whether the reasoning or

methodology underlying the testimony is scientifically valid. *See Dartey*, 104 F.Supp.2d at 1022; *United States v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999). Subjective belief or unsupported speculation must be ruled out. *See Hall*, 165 F.3d at 1102.

**II.     Mr. Speckin's opinion in this case is not supported by reasonable scientific techniques.**

Mr. Speckin's report in this case is full of "subjective" determinations not based on scientific principle that allow Mr. Speckin to "tailor his results to suit his client's requirements" *Re Estate of Wang*, 2002 WL 1341762, at ¶ 29.31(f) (**Ex. B**). Also similar to his opinion in his earlier case, "the weakness of the confidence level was concealed within such phrase as 'to a reasonable degree of scientific certainty.'" *Id.* at ¶ 27.6.

At deposition, Mr. Speckin admitted that he cannot determine one way or the other whether the date on the June 14, 1997 conception drawing ("Q-1") is accurate and does not know when the impressions from later documents that he allegedly found were made. *Report of E. Speckin*, at ¶ 13 (**Ex. C**). Similarly, Mr. Speckin does not know when the February 20, 1999 ("Q-2") and the May 20, 2000 ("Q-6") documents on which he purports to rely for his opinions were actually written (*Deposition of E. Speckin*, at 47:23-48:16) or when the impressions in them and on Q-1 were made. *Id.* at 46:22-47:22 (**Ex. A**).

While he did not bother to mention it in his report, Mr. Speckin conducted an analysis on the conception drawing to determine which were made first, the impressions or the actual writing on the document. *Id.* at 62:2-9. He could not determine whether the impressions or the actual writing came first. *Id.* at 62:2-64:25. Despite being unable to date Q-1 or the other documents and not being able to tell which came first on Q-1, the impressions or the writing, Mr. Speckin was able to tailor his opinion to conclude that the date written on Q-1 could not be relied upon.

To make his conclusion, Mr. Speckin was forced to rely on indirect circumstantial "evidence" of date order. However, during cross-examination it was revealed that none of the "evidence" supporting his conclusion was gathered scientifically. Below, ASP shows how a few conclusions by Mr. Speckin are wholly unsupported by any scientific evidence. His other conclusions are similarly devoid of support, but for purposes of brevity here, ASP does not go into each in detail.

**Mr. Speckin's unsupported conclusion #1 and #2:**

> Q-2 was made while fixed in a position above the Q-1 drawing, **"probably while still bound in a pad or tablet. This can be easily seen by comparing the graph lines from the graph paper … which line up perfectly."** *Report of E. Speckin*, at ¶ 17 (**Ex. C**).

> Q-1 and Q-2 were both affixed in a pad when the impressions were made "**because the graph paper is similar to a commercially available pad made by Ampad as well as others**." *Id.* at ¶18.

**Evidence showing these conclusions are not based on scientific principles:**

> Mr. Speckin did not know the brand of graph paper Q-1, Q-2 or Q-6. *Deposition of E. Speckin*, at 127:14-18.

> He did not know what paper making machine in the plant made the paper. *Id.* at 127:19-21.

> He did not know how the graph lines are printed on a plane white page to make it graph paper. *Id.* at 129:11-19.

> He admitted that the same blade could cut millions of sheets of paper. *Id*. at 128:18-21.

> He conducted no testing on other paper to determine if they also have graph paper lines that line up. *Id.* at 131:1-13.

> He did not consider other pads or any other source of graph paper to learn whether all of the graph paper had graph lines that line up. *Id.* at 132:3-12.

> He did not know the tolerance for the spaces between the squares. *Id.* at 134:5-17.

> He did not know what the tolerance is for lining up graph paper on the side or if they even pay attention to that. *Id.* at 134:20-135:1.

He did not measure the distance from the edges in the actual samples here.  *Id.* at 141:25-142:5.

He did not compare the graph lines to any control.  *Id.* at 142:21-25.

In other words, Mr. Speckin conducted no scientific analysis to first determine whether the lines actually matched up perfectly (he did not measure them) and second to determine if having matched-up lines was unique to one potential pad or whether thousands or millions of pages of graph paper would similarly line up (he did not know the make of the graph paper or compare the pages to any controls).   Instead, Mr. Speckin made a speculative, unsupported conclusion that the graph-lines lined up and therefore must be from the same pad (as shown below, this conclusion is also in conflict with objective evidence that the pages were not from a pad, namely lack of glue residue or perforations from tearing, which Mr. Speckin was aware of but failed to report to the Court or consider in making his determination).[1]

**Mr. Speckin's unsupported conclusion #3:**

Q-1 and Q-2 were affixed in the same pad **because there are similar aligned marks present on the edges of the drawings, which are likely blade marks resulting from the pages being cut to size in the manufacturing process.**  *Report of E. Speckin*, at ¶ 19 (**Ex. C**).

**Evidence showing this conclusion is not based on scientific principles:**

Mr. Speckin knew nothing about the way that graph paper generally is made, or how the specific graph paper of Q-1 or Q-2 was made.  *Deposition of E. Speckin*, at 17:10-15.

He admits that the same blade could cut millions of sheets of paper.  *Id.* at 128:18-21.

He did not know what cutting machine was used.  *Id.* at 127:22-128:2.

---

[1] While not necessary to show that Mr. Speckin's opinion does not meet scientific rigor, it turns out that his lack of knowledge is particularly troublesome here.   ASP's expert Ms. Will found that of 6 randomly purchased pads of AMPAD paper, two pair of pads were close matches in distance-to-edge measurement.   Extrapolating, there are literally thousands of pads where the lines of the graph paper line up.

He did not know how many times a certain blade is used in a year. *Id.* at 128:18-21.

He did not compare the blade marks to any control documents (*Id.* at 144:14-21) and so does not know if the blade marks are unique.

He did not know whether there could be many other pages with the same blade marks. *Id.* at 145:19-22.

He did not even know whether the blade is a straight blade or a circular blade. *Id.* at 147:10-15.

He admitted that the same blade could be used to cut millions of pages and each could have the same blade marks. *Id.* at 147:16-24.

**Mr. Speckin's unsupported conclusion #4:**

Q-2 was written on top of the page that became Q-1 **while bound in a pad because the documents are in alignment**.

**Evidence showing that this conclusion is not based on scientific principles:**

Mr. Speckin makes the observation that the impressions from Q-1 and Q-2 are in alignment. From that observation, he jumps immediately to the conclusion that they were bound in the same pad when made. He does not consider the viable alternative that the pages were not bound in a pad but still maintained in alignment. He just makes a conclusion that supports his case. Notably, he:

Does NOT cite any kind of scientific study addressing the ability of people to keep "loose" (i.e. unbound) pages aligned during the writing process.

Does NOT conduct any analysis as to how any such study would apply specifically to Dr. Parsons, an engineer who might have individual preferences for precision in the writing of concept drawings.

Does NOT consider the potential use of "drawing dots" or magnets to keep pages in alignment.

Does NOT consider the use of drawing tables with sliding rulers (such as the one used by Dr. Parsons) and their impact on alignment.

Instead, Mr. Speckin takes a plain observation and chooses the one explanation that suits his

client's overall position while failing to consider the reasonable alternatives. His testimony cannot be credited.

**Mr. Speckin's unsupported conclusion #5:**

> Q-2 was written while on top of the page that became Q-1 (*Addendum to Report of E. Speckin*, at ¶ 9(a) (**Ex. D**)) **because people normally write from the top of the tablet down.**

**Evidence showing this conclusion is not based on scientific principles:**

Mr. Speckin admits in his deposition that his conclusion that Q-2 was written on top of the page that became Q-1 would not be correct if either (1) the documents were not fixed in a pad (this unsupported conclusion has been demonstrated as not valid above) *or* (2) if it were assumed that a person wrote from the bottom of the tablet up. *Deposition of E. Speckin*, at 65:21:66:6 ("If you want me to assume that the person wrote from the bottom of the tablet up, then I would say well, then that may not be the case."). Like in many other areas of his report, Mr. Speckin *assumes* a point that coincidentally supports his position. Mr. Speckin had no *scientific* support for his assumption.

In this case, Mr. Speckin's has unproven assumptions layered on unproven assumptions. He concludes that Q-2 was written before Q-1 based on the unproven assumption that they are in the same pad. Even assuming his first assumption is true (it has not been established), he then assumes that all people proceed in order from the top to the bottom of a pad of paper without flipping back and forth between pages. When challenged, Mr. Speckin admits that he has no scientific support for this assumption. *Id.* at 66:8-19.

**IV.    Mr. Speckin improperly withheld information that contradicted his conclusions.**

Not only did Mr. Speckin make conclusions based on unsupported assumptions and analysis, he also failed to report or consider hard evidence that contradicted his conclusions.

This failure prejudices ASP and further highlights Mr. Speckin's unreliability as an expert.

A central tenet of Mr. Speckin's opinion is that Q-1 and Q-2 were graph papers that were affixed in a pad. To be in a pad, a piece of graph paper would have to be glued or otherwise affixed to the pad.

In his analysis, Mr. Speckin looked for perforations where Q-1 or Q-2 would have been ripped from a pad. *Deposition of E. Speckin*, at 122:2-13. He found none. *Id.* The lack of perforations is evidence contradicting his conclusion that the pages came from a pad. However, Mr. Speckin did not consider or report it. *Id.*

In his analysis, Mr. Speckin examined the edges of Q-1 and Q-2 for glue, visibly and with a microscope. *Id.* at 124:6-8. He did not find any glue. The lack of glue is evidence contradicting his conclusion that the pages came from a pad. Mr. Speckin did not consider or report it. *Id.* at 124:9-19. It was improper for Mr. Speckin to withhold objective evidence that his opinion was not correct.

Mr. Speckin's ultimate conclusion is that Q-1 was not created on the date that is indicated in writing on it. In his analysis, Mr. Speckin tried to determine which came first, the impressions in Q-1 or the actual writing on Q-1. *Id.* at 62:2-9. He tried to conduct a line-sequencing analysis, but it was not determinative. The inability to tell which came first, the impression or the writing, shows that there is no clear answer as to which document was created first. Mr. Speckin did not even report that he conducted the test. *Id.* at 62:10-14. Mr. Speckin conducted a side lighting examination of the documents. When that testing was inconclusive, he again did not report it. *Id.* at 64:4-25. These glaring omissions from his report show that Mr. Speckin did not conduct an objective examination to determine the truth. His report and testimony should be excluded.

## CONCLUSION

Mr. Speckin's report and opinion do not meet the minimum level of competency and reliability to be admissible under Federal Rule of Evidence 702 or *Daubert*. As such, ASP respectfully requests the Court to exclude all testimony and opinions by Mr. Speckin.

Dated: April 2, 2007

s/ Michael J. Hanrahan
Bruce O'Neill, Esq.
Michael Hanrahan, Esq.
Fox, O'Neill & Shannon, S.C.
622 North Water Street, Suite 500
Milwaukee, WI 53202
(414) 273-3939

A. Sidney Katz
Richard W. McLaren, Jr.
Steven E. Feldman
WELSH & KATZ, LTD.
120 South Riverside Plaza – 22nd Floor
Chicago, IL 60606
Telephone: (312) 655-1500
Facsimile: (312) 655-1501

*Attorneys for Plaintiff Armament Systems and Procedures, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2007, I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to all of the attorneys of record on the ECF system for Case No. 00-CV-1257.

I hereby certify that I have mailed by United States Postal Service the document to the following non-ECF participants:

> Maurie E. Gauthier
> Samuels, Gauthier & Stevens
> 225 Franklin Street, Suite 3300
> Boston, MA   02110
>
> Peter E. Heuser
> Kolisch Hartwell Dickinson McCormack & Heuser
> 200 Pacific Bldg.
> 520 SW Yamhill Street
> Portland, OR   97204
>
> Campbell Killefer
> Venable LLP
> Terrell Place
> 575 7th Street, NW
> Washington, DC   20004-1601

> s/ Michael J. Hanrahan
> Michael J. Hanrahan
> State Bar No. 1019483
> Attorney for Armament Systems
>      and Procedures, Inc.
> Fox, O'Neill & Shannon, S.C.
> 622 North Water Street, Suite 500
> Milwaukee, WI   53202
> (414) 273-3939 – Phone
> (414) 273-3947 – Fax
> mjhanrahan@foslaw.com