# EXHIBIT A
# (excerpted)

ROUGH DRAFT OF ERICH SPECKIN - 3/29/07

VIDEOGRAPHER: We are on the record. This is tape and disk one of the deposition of Erich Speckin, being taken at the law offices of Brooks Kushman, 1,000 Town Center, 22nd floor, Southfield Michigan. Today is Thursday, March 29, 2007. The time is approximately 9:15 a.m.. this is in the matter of Armament Systems and procedures ink versus IQ Hong Kong limited et al. Civil action until 00-C-1257, pending in U.S. district court for the eastern district of Wisconsin. My name is Patrick Murphy, legal videographer for Esquire Deposition Services. The attorneys will now introduce themselves for the record.

MR. McLAREN: My name is Richard McLaren, I represent Armament Systems and with me today is expert Emily Will and my client, Kevin Parsons.

MR. CUNNINGHAM: Tom Cunningham on behalf of IQ Hong Kong and Zen Design.

MR. CURTIN: Peter Curtin of Venable, here on behalf Vector projects, Northland, fishing and tackle, mills fleet farm and the carqwest defendants.

MR. SCOTT: Craig Scott on behalf of Admissive

Page 46

1  A. To a reasonable degree of scientific certainty, I
2     believe that they are. Not to a certainty, though.
3  Q. To a reasonable degree of scientific certainty, those
4     are impressions?
5  A. Correct.
6  Q. When were they put into the document from which you did
7     this ESDA lift?
8  A. I don't --
9       MR. SCOTT: Objection to form.
10      MR. McLAREN: Basis.
11      MR. SCOTT: When what was what put into the
12   document.
13      MR. McLAREN: We will be real careful here.
14 Q. (By Mr. McLaren): Referring to the two green lines,
15    which are impressions in the document, when were the
16    impressions put in the document, Mr. Speckin?
17      MR. CUNNINGHAM: Objection.
18      MR. McLAREN: Basis.
19      MR. CUNNINGHAM: The green lines themselves
20   aren't impressions.
21      MR. McLAREN: Try it again.
22 Q. (By Mr. McLaren): Mr. Speckin, referring to the green
23    highlighting, you have highlighted impressions,
24    correct?
25 A. Correct.

Page 47

1  Q. When were those impressions put in that piece of paper?
2  A. I don't know.
3  Q. With regard to the orange lines to the lower right,
4     when were those impressions put into the piece of
5     paper?
6  A. I don't know.
7  Q. What about the yellow line, when was that impression
8     made?
9  A. I don't know.
10 Q. Can you opine to a reasonable degree of scientific
11    certainty with regard to the date of the piece of paper
12    Q-2 based on those three sets of impressions?
13 A. Sorry, I don't understand that question.
14 Q. There is a piece of paper you call Q-2, correct?
15 A. Right.
16 Q. And the five lines that you have highlighted on your
17    ESDA lift are impressions in that piece of paper,
18    correct?
19 A. Right.
20 Q. And you don't know when those impressions were made
21    correct?
22 A. That's right.
23 Q. Can you opine to a reasonable degree of scientific
24    certainty with regard to the validity of the date that
25    is written on the piece of paper Q-2, based on those

Page 48

1     impressions we have just mentioned?
2  A. No, I haven't drawn an opinion as to whether the date
3     -- let me back up. Your question appears to me to be
4     that can I say anything about whether Q-2 was written
5     on February 20th, 1999, or at some other time?
6  Q. Yes. Based on those five impressions we have just
7     discussed?
8  A. And the answer would be no, I don't know one way or the
9     other and I don't have an opinion.
10 Q. Okay. And with regard to Q-6, I'm going to shoot for
11    the same question. Can you opine to a reasonable
12    degree of scientific certainty with regard to whether
13    the piece of paper was sketched on 20 May 2000 based on
14    the impressions that we have just discussed for the
15    last five minutes?
16 A. No, not -- no opinion one way or the other.
17 Q. Is it possible to reach an opinion to a degree of
18    scientific certainty based on your ESDA lifts of the
19    impressions we have just discussed with regard to the
20    validity of that date?
21 A. Based on what I have in front of me right now, the ESDA
22    films and what I know at this point in time?
23 Q. Yes.
24 A. I haven't really thought about this before. I'm really
25    not prepared to answer. I don't -- I don't know of any

Page 49

1     way off the top of my head, but there very well could
2     be something, I just haven't thought about it with all
3     the sequences that we have from one document into the
4     next, so I can't really answer it as I sit here though.
5  Q. All right. Let me follow upon the sequences point.
6     Assume with me that I take a pen and do a
7     sketch on a sheet of paper A, all right, would you
8     assume that.
9  A. Sure.
10 Q. Okay. Pen and I do a sketch on sheet of paper A. And
11    underneath it is sheet of paper B. Are you with me so
12    far?
13 A. Not too complicated yet.
14 Q. Yes, sir. It is your opinion that there would be an
15    impression on sheet B, the one underneath, from my
16    sketch on sheet A, correct?
17 A. That there would be for a fact? Not necessarily.
18 Q. To a reasonable degree of scientific certainty, would
19    there be an impression?
20 A. Well, it wouldn't be a question of scientific
21    certainty, it would be a question of circumstance. In
22    most instances, yes, it would be.
23 Q. Fair enough.
24 A. But there are things that could happen that would cause
25    an impression to not be there, but in most instances

Page 62

1  primarily used.
2  Q. Okay. And in the course of this examination with
3     microscope, camera and hand held, did you do a line
4     sequencing analysis of any of the graphite with any of
5     the impressions on any of the documents you examined?
6  A. I think I looked at it on Q-1, I believe. And I didn't
7     see anything at all that would help me out. I don't
8     think I looked at the sequencing on any of the other
9     documents.
10 Q. Would you look at either one of your reports and show
11    me where you refer to a line sequencing analysis? And I
12    will represent to you that I do not believe that those
13    words are in either report?
14 A. They are not.
15 Q. Why is it you did not disclose you had done a line
16    sequencing analysis?
17 A. Because I just looked at it briefly and I didn't think
18    it would help one way or the other.
19 Q. You testified a minute ago, Mr. Speckin, as I
20    understood it, that it is possible to tell which came
21    first, the impression or the graphite, based on those
22    nine factors you listed?
23 A. I said it is possible in some instances, that's
24    correct.
25 Q. Okay. Are you telling me that it is not possible with

Page 63

1  regard to any of the documents here?
2  A. No.
3  Q. But you did it in Q-1 and you found nothing, correct?
4  A. Correct.
5  Q. Okay. And you did not do it on any others?
6  A. Not that I recall, that's correct.
7  Q. But you don't know whether it would have revealed
8     something if you had done it?
9  A. Of course not, I don't know.
10 Q. Well, I mean, you saw impressions on your ESDA list,
11    correct?
12 A. Right.
13 Q. And you said that the size of the impression was number
14    one factor on whether or not you could do an
15    intersection analysis between graphite and an
16    impression, right?
17 A. That's correct.
18 Q. Okay. So based on the size of the impressions you saw,
19    okay, based on your ESDA lifts, would it be possible to
20    do an intersection sequencing analysis?
21 A. First, as I said, I don't know, I didn't look at it.
22    Second of all, the ESDA impression doesn't tell you the
23    size of the impression. Looking at a film, you don't
24    know how big the impression is in the paper.
25 Q. Okay.

Page 64

1  A. It is a two dimensional rendition of impressions, not a
2     three dimensional one, so the first part of the
3     question is non sense calendar to the examination.
4  Q. Okay. I apologize. You are the expert here. Is there
5     a thing called side lighting examination?
6  A. Yes.
7  Q. Does that show you the size of the impression?
8  A. Yes.
9  Q. Did you do it?
10 A. Yes.
11 Q. And based on the side lighting examination of any of
12    the documents, can you tell me whether it would be
13    possible to do an intersections sequence analysis of
14    the graphite with the impressions you found?
15 A. I didn't look at it for the purpose of anything other
16    than Q-1, so I don't know. I don't recall the document
17    specifically enough to answer your question and I
18    didn't examine it for that purpose.
19 Q. Was it your purpose, Mr. Speckin, to determine which
20    came first, the impressions or the graphite?
21 A. Only as it related to Q-1 at the time I was in Chicago.
22 Q. Can you opine to a reasonable degree of scientific
23    certainty which came first on Q-1, the impressions you
24    found or the graphite that's on Q-1?
25 A. No.

Page 65

1  Q. You say that you can opine on paragraph nine that of
2     your Exhibit 3 -- are you with me -- 9 A, B, C?
3  A. Correct.
4  Q. Okay. That Q-2 was written while fixed in perfect
5     alignment on top of but within a few a pages or less of
6     the page that became Q-1. Did I read that correctly?
7  A. That's correct.
8  Q. Okay. And in that phrase, you say the page that became
9     Q-1, rather than saying how you described Q-2, which is
10    just referring to it as its designation Q-2. Do you
11    notice that?
12       MR. SCOTT: Objection to form.
13 A. Did I say it became Q-1?
14 Q. Yeah. You say that that page that became Q-1.
15 A. Sure, I understand why.
16 Q. Okay. My first point is, you contrast the two in A,
17    you say Q-2, not the page that became Q-2, right?
18 A. Correct.
19 Q. And then you say the page that became Q-1, correct?
20 A. Absolutely.
21 Q. But you cannot opine which came first, the graphite or
22    the impressions on Q-1, you just said so, right?
23 A. From the ESDA film or the side lighting, but based on
24    the fact that it was fixed on the tablet and people
25    normally write from the top of the tablet down as

Page 66

1  opposed to the bottom of the tablet up, that would be a
2  correct statement.
3  Q. Okay.
4  A. So if you want me to assume that the person wrote from
5    the bottom of the tablet up, then I would say well,
6    then that may not be the case. But based on everything
7    else, that's my conclusion.
8  Q. All right. Let's assume -- let's just take your answer
9    and talk about that.
10       Can you tell me where in your report you site
11    a scientific article, peer reviewed, that people
12    ordinarily write sketch, not write, sketch, a drawing
13    on a pad of paper from the top down.
14 A. You know, I don't know if that's ever been published in
15    a scientific journal or not.
16 Q. You site none in your report?
17 A. I definitely do not site one in the report.
18 Q. Have you ever read one?
19 A. Not that I can think of.
20 Q. Can you tell me whether there is any recognized
21    treatise in the area of forensics that says that people
22    have been studied in ordinarily sketch inventions on a
23    pad from the top page down?
24 A. You know, it seems so obvious to me that I don't know
25    that I have ever even looked for that or heard anyone

Page 67

1    discuss it before. I have never heard anyone argue to
2    the contrary that I can think of in my lifetime. There
3    probably is one that exists, but I have never paid
4    attention.
5  Q. You go none 9 B and you say Q-6 -- I'm reading, so
6    check me on this. Quote Q-6 was written while fixed in
7    perfect alignment on top of the page that became Q-2
8    while Q-2 was fixed above Q-1. Paren, both Q-2 and Q-1
9    were purportedly done one and three years prior to Q-6.
10   Closed paren. Did I read that correctly?
11 A. I believe that was verbatim.
12 Q. Okay. Now looking up in paragraph eight, reading that
13   last sentence, begins the common impressions, are you
14   with me?
15 A. Okay. Yes.
16 Q. Quote the common impressions are much stronger on Q-6
17   than on Q-2 and spaciously lined up with the graph
18   paper lines which again shows that Q-6 was fixed in
19   near perfect alignment on top of Q-2 when the drawing
20   was of unknown origin was made. Did I read that
21   correctly?
22 A. I believe so.
23 Q. So in paragraph eight, you describe them as being fixed
24   in near and I am emphasizing near perfect alignment,
25   but in the next paragraph you describe them in nine B

Page 68

1   as being fixed in perfect alignment. Correct?
2  A. That's correct.
3  Q. Why did you make that change?
4  A. Because I don't have the document that of unknown
5    origin to say exactly that the graph paper lines up
6    with the document itself, so I was more conservative
7    when I said near perfect. And the other one, I have
8    Q-1, Q-2 and Q-6. In other words, every document
9    that's referenced in that paragraph, I have and was
10   able to examine. I was not able to examine the
11   document, quote unquote, of unknown origin, so I was
12   more conservative in my opinion.
13 Q. Okay. Maybe I am misreading this. In paragraph eight
14   you are talking about common impressions on Q-6 and
15   Q-2, correct?
16 A. Correct.
17 Q. Okay. And you are saying that Q-6 and Q-2 were lined
18   up?
19 A. Correct.
20 Q. So the exact words were -- I'm reading the second to
21   last line, paragraph eight. Q-6 was fixed in near
22   perfect alignment on top of Q-2. Etcetera. End quote.
23   Did I read that correctly?
24 A. Correct.
25 Q. So you are referring to Q-6 on top of Q-2?

Page 69

1  A. Correct.
2  Q. Okay. Now in nine, B, Q-6, same Q-6, right, Mr.
3    Speckin,?
4  A. That's correct.
5  Q. Okay. Was written while fixed in perfect alignment on
6    top of the page that became Q-2, etcetera, end quote.
7    Did I read that correctly?
8  A. Yes.
9  Q. Same Q-2, right?
10 A. That's correct.
11 Q. So from paragraph 8 to paragraph 9, your opinion
12   changed from near perfect to perfect, right?
13 A. Based on something -- they are not exactly the same
14   thing that was examined there.
15 Q. Okay. Let me go back. Paragraph 8 refers to exactly
16   two things. Q-6 and Q-2, I'm referring to the last
17   line that I just read you. Shows that Q-6 was fixed in
18   near perfect alignment on top of Q-2, etcetera,
19   etcetera.
20 A. I didn't follow exactly along because I was reading
21   something else when you said it, but the last four
22   times you read it it was verbatim, I assume that time
23   it probably was.
24 Q. Okay. Paragraph eight refers to Q-6, near perfect, on
25   top of Q-2. Paragraph nine B refers to Q-6, perfect on

18 (Pages 66 to 69)

Page 122

1  A. I don't believe it is in there.
2  Q. I don't believe it is either. How about the word
3     perforations as when you rip off a page like on my
4     legal pad here, perforations, is the word perforations
5     in your report?
6  A. No.
7  Q. In your addendum?
8  A. No.
9  Q. Did you examine the pages to see if they had
10    perforations?
11 A. Yes.
12 Q. And where they there?
13 A. I did not see any.
14 Q. And you did not report the fact that they weren't
15    there?
16 A. No, I don't believe I did.
17 Q. The absence of any perforations would tend to suggest
18    that they were -- that the piece of paper was not in a
19    pad, it would be one element of evidences that it was
20    not part of a pad, true?
21 A. Not with graph paper, no.
22 Q. You are telling me it is impossible that graph paper
23    could have been bound like my legal paper?
24 A. Of course I didn't say that.
25 Q. So it is possible and the absence of perforations would

Page 123

1     be evidence that the piece of paper you are dealing
2     with didn't come from a pad like this, would it not?
3        MR. SCOTT: Objection to form.
4  A. Would it be evidence of that? No. I wouldn't say it
5     would be evidence of that because most of the graph
6     paper that I am familiar with that I have seen isn't
7     perforated.
8  Q. That wasn't the hypothetical, Mr. Speckin. I'm asking
9     you about your finding that you didn't report that
10    there were no perforations, that you looked for them
11    and there were none. That's what I'm asking you about.
12    Are you with me?
13 A. I'm with you so far. That's what I have been
14    answering.
15 Q. Do you regard the absence of perforations to be not
16    useful whatsoever in determining whether the pieces of
17    paper came from a pad?
18        MR. SCOTT: Objection. That's precisely the
19    question he was answering before you accused him of not
20    answering your question. As the record will reflect,
21    sir.
22 A. Do I consider the absence of impressions any evidence
23    at all?
24 Q. Absence of perforations?
25 A. That's what I meant, right, right.

Page 124

1  Q. Yes?
2  A. Do I consider any evidence at all that what?
3  Q. That the piece of paper came or didn't come from a pad?
4  A. No, not with graph paper. Like I said, because most of
5     the time it is not perforated.
6  Q. All right. How about glue, do you -- did you examine
7     the edges of the original documents for glue?
8  A. I looked visibly and with a microscope, yes.
9  Q. And you did not report that in your report?
10 A. Specifically that, no, I said I examined it with a
11    microscope and I said I examined the edges with a
12    microscope when you asked me earlier, but I don't think
13    it is as specifically that in the report.
14 Q. The word glue is not in there, we agreed to that,
15    right?
16 A. Yes.
17 Q. Okay. So you did not report that you looked for glue,
18    fair?
19 A. That's correct.
20 Q. Okay. But you're testifying today that you did look
21    for glue, true?
22 A. True.
23 Q. And you found none, right, Mr. Speckin?
24 A. Yes, that's right.
25 Q. Not on any of the documents that you reviewed?

Page 125

1  A. I believe I only looked at Q-1 and maybe Q-2 for that.
2  Q. And found no glue?
3  A. That's right.
4  Q. Do you regard that as being useless as far as evidence
5     of whether the piece of paper came from a pad?
6  A. I wouldn't say it is useless, no.
7  Q. Isn't it some evidence that the piece of paper did not
8     come from a pad?
9  A. Not based on everything else that I have, no.
10 Q. Why is that?
11 A. Because the --
12 Q. Understand I'm asking why isn't the absence of glue
13    important here? That's the question.
14 A. Because the alignment of the impressions and all the
15    films that I have is so overwhelminging obvious that it
16    was in a pad that I didn't consider that to be a likely
17    scenario that just because it didn't have the glue that
18    it wasn't from a pad.
19 Q. So if you were able to do a test microscopically of the
20    edges of the paper and determine that there had been no
21    glue on them ever, you still would not consider it
22    important because of the alignment of the graph paper?
23 A. There would be no way to conclude that there had never
24    been no glue on them. That's why your hypothetical --
25    that's why you don't think I'm making sense probably.

32 (Pages 122 to 125)

Page 126

1. You could never like at it microscopically and say this
2. document never had glue on it. It is not possible.
3. Q. Is that your testimony under oath, Mr. Speckin, that
4. you cannot look at the edge of a piece of paper and
5. tell whether there has never been any glue on it?
6. A. Correct.
7. Q. Okay. Now let me ask you this. You mentioned Ampad
8. here in your report correct?
9. A. Which report?
10. Q. I will find it. Would you look for it too, please? See
11. if you can find it.
12. A. I believe it is paragraph 19 of the first report.
13. Q. And that would be the manufacturer of my legal pad?
14. A. One in the same.
15. Q. Yes. And do you know whether or not the original
16. pieces of paper that you examined, for example, the
17. original that is right there, was in fact manufactured
18. by Ampad?
19. A. No.
20. Q. Do you know who the manufacturer of any of the pieces
21. of paper in fact was?
22. A. I think one of them it is on the paper. I would have
23. to review -- I have the copies here.
24. Q. Yes. That's all right. I will tell you Q five says 3M
25. in tiny letters across the bottom. Other than that

Page 127

1. one, do you know the manufacturer of any of the
2. documents?
3. A. Accepting that that's correct, then I don't know any of
4. the other ones, no.
5. Q. Did you take any steps to determine the actual
6. manufacturer of any of the pieces of paper?
7. A. Yes.
8. Q. And what steps did you take?
9. A. I looked for any identifying characteristics on the
10. paper, either the front or the back, or for a water
11. mark that was embedded into the paper, and I didn't see
12. anything. In any of the documents other than the one
13. that had the notation on the front.
14. Q. Since you don't know the manufacturer of any of the
15. pieces of paper but the one, which I represented, not
16. you, okay, says 3M, you also therefore don't know what
17. plant manufactured any of the pieces of paper, true?
18. A. Of course.
19. Q. And you don't know what paper making machine in the
20. plant manufactured any of the paper, true?
21. A. Of course.
22. Q. Okay. And similarly, you do not know what cutting
23. machine cut any of the edges of any of the pieces of
24. paper, true?
25. A. What specific machine?

Page 128

1. Q. Yeah.
2. A. Of course, I don't.
3. Q. And you don't know even the type of cutting machine
4. that is the manufacturer of the machine, for example,
5. that cut any of the edges of any of the pieces of
6. paper, true?
7. A. Can you read that one back to me, please.
8.     (Whereupon the question was read.
9.     Back by the court reporter.)
10. A. I don't know the type or the manufacturer, I guess that
11. would be a compound question, but I don't know either
12. one.
13. Q. Okay. You don't know how many times the cutting blade
14. comes down per day, would that be fair?
15. A. Of course not.
16. Q.
17. A. That's fair.
18. Q. And you don't know how many times the blade is used per
19. year, could be used to cut 10 million sheets of paper
20. for all you know, correct?
21. A. Could very well be.
22. Q. Do you know how often a company that makes graph paper
23. uses a blade to cut the sheets of paper to eight and a
24. half by 11 size, do you know the answer?
25. A. Every tablet. No, I don't know how many times though.

Page 129

1. Q. Well, let me rephrase the question. Do you know how
2. many sheets of paper are cut by a blade before they
3. changed the blade?
4. A. I have no idea.
5. Q. Could it be 10 million?
6. A. Although I don't know, that strikes me as really high,
7. but I have to say, I don't know.
8. Q. Do you know the size of the piece of paper when it is
9. made graph paper? Do you understand the question?
10. A. You mean before it is cut?
11. Q. No, I'm talking about when the paper which is plane,
12. let's say white, becomes graph paper, with grid lines,
13. do you know what size that paper is when it is made
14. graph paper?
15. A. When the lines are printed on it you mean?
16. Q. Yes.
17. A. No.
18. Q. Do you know how the lines are printed on it?
19. A. No.
20. Q. Do you know the proximate size of the machine that
21. prints the graph paper on it?
22. A. No idea.
23. Q. Do you know how many eight and a half by 11 sheets are
24. printed at a time when graph paper is made?
25. A. Well first, I don't even know what size they are as I

33 (Pages 126 to 129)

Page 130

1  said earlier.
2  Q. Except that they are bigger than eight and a half by 11
3     or maybe exactly eight?
4  A. I don't know.
5  Q. Well, they can't be smaller, can they?
6  A. They definitely aren't smaller, but I don't know that
7     they are exact. They could be bigger and then cut, I
8     don't know.
9  Q. Yes. Okay. Do you know what size -- assume with me
10    that the paper is manufactured and placed on a roll.
11    Do you know how big the roll is?
12 A. It varies by manufacturer.
13 Q. Okay. And of course you don't know the manufacturer of
14    these originals that we are talking about here?
15 A. That's correct.
16 Q. During your second examination --
17 A. Is this okay for like a five minutes.
18    MR. McLAREN: Yeah, sure. 1:345. Off the
19    record.
20    VIDEOGRAPHER: We will go off the record at
21    1:43.
22    (Whereupon a break was taken.
23    From
24    VIDEOGRAPHER: We are back on the record at
25    2:03. Please proceed.

Page 131

1  Q. (By Mr. McLaren): Mr. Speckin, you testified a number
2     of places that the graph paper lines line up, correct
3     in in your reports?
4  A. It is mentioned in many places. Is that your question?
5     Yes.
6  Q. Yes. I did not find any reference to any tests that
7     you did with regard to pads of paper or reams of paper
8     other than the originals involved in this case. Is
9     there any such reference in your reports.
10 A. Any such reference to what, testing on reams or pardons
11    of paper?
12 Q. Right.
13 A. I don't believe so.
14 Q. Did you do any testing or analysis of reams or pads of
15    paper other than the originals that are involved here?
16 A. Let me take that back. 19 A pretty clearly says the
17    graph paper is similar to a commercially available pad
18    made by Ampad as well as others. So that was one thing
19    that I did do, I did get some Ampad pads to look at the
20    paper in them, the layout, formatting, that sort of
21    thing. So that would be the answer to both of your
22    questions, that is what I did and I take back my answer
23    previously that I did do something that was mentioned
24    in the report and it is under 19 A.
25 Q. All right. Did you make any measurements of the graph

Page 132

1     paper lines on the Ampad pads that you purchased?
2  A. I don't believe so.
3  Q. Do you still have the Ampad pads that you purchased?
4  A. Yes.
5  Q. Are they here today?
6  A. No.
7  Q. Did you consider them?
8  A. No.
9  Q. Did you consider any other sources of graph paper such
10    as reams of graph paper or other manufacturers of pads?
11 A. Nothing directly. I mean, other than what I have seen
12    in my lifetime.
13 Q. Have you -- do you have any knowledge or experience
14    with regard to the tolerances adhered to by
15    manufacturers of graph paper?
16 A. What do you mean tolerances?
17 Q. I mean the distance between the tiny blue lines and the
18    distance between the tiny blue lines and the edge of
19    the paper. Two examples.
20 A. The first, the distance between the tiny blue lines, I
21    would say is pretty standard. The distance between the
22    blue lines and the edge of the paper, I have no idea if
23    they even pay attention to that or not.
24 Q. And do you know what the margin of error is on an Ampad
25    pad for the distance between the Titanly little blue

Page 133

1     lines?
2     MR. SCOTT: Objection to form.
3  A. No, I don't know what the margin of error is.
4  Q. Are the -- how far apart are the tiny little blue lines
5     on the originals of Q-6?
6  A. I don't know.
7  Q. Well, eye ball it and just give me your best estimate.
8     Would you say they are a millimeter apart?
9  A. Well, actually, I I don't think I am that good at the
10    metric system to be able to tell you.
11 Q. 8th of an inch or 16th of an inch?
12 A. Let's see.
13    MR. CUNNINGHAM: Objection. Calls for
14    speculation.
15 A. Yeah, probably an eighth maybe. I don't know exactly
16    though. Just a guess.
17 Q. How many major squares are there top to bottom?
18 A. Pretty close to 11.
19 Q. Okay. Would you say that the major squares an inch?
20 A. Probably a little bit over, but I don't know, I am just
21    guessing.
22 Q. Yes. Well, I mean, it is an eight and a half by 11
23    piece of paper, correct?
24 A. Right.
25 Q. And how many squares major squares across?

34 (Pages 130 to 133)

Page 134

1  A. About eight and a half.
2  Q. Okay. And how many little tiny squares within a major
3     square, would you agree ten by ten?
4  A. Yes.
5  Q. Okay. And do you know what the tolerance -- I think I
6     asked you that before. You do not know what the
7     tolerances are that the printing companies follow for
8     the accuracy of those little blue lines, right?
9         MR. CUNNINGHAM: Objection.
10 A. So your question is based on what we just said, that
11    the squares are probably a tenth of an inch?
12 Q. Right.
13 A. So how exactly are they -- how close are they to a
14    tenth of an inch?
15 Q. Exactly. What's the plus minus, the margin of error
16    for the little blue lines?
17 A. No idea.
18 Q. Okay. And how about the edges?
19 A. How about them?
20 Q. What's the margin of error that typical graph paper
21    manufacturers follow with regard to the distance
22    between the little tiny blue lines and the edge of the
23    paper?
24        MR. CUNNINGHAM: Objection.
25 A. That's the one I said I don't even know if they pay

Page 135

1     attention to that.
2  Q. Yes. Okay. And you didn't do any testing of that,
3     correct?
4  A. I looked at other pieces of graph paper when I got the
5     Ampad to see how it varied from pad to pad, and I saw
6     that there was a variance from pad to pad.
7  Q. How many pads did you test or look at?
8  A. I think there were six. I bought a bundle and I think
9     there was six pads in the bundle or maybe five.
10 Q. Do you still have the pad, the bundle?
11 A. Yes.
12 Q. Did you bring it here today?
13 A. No.
14 Q. Have you ever mentioned that in your report anywhere?
15 A. As I said when you asked me before, I think it is
16    mentioned peripherally in 19 A when I said it is
17    commercially available -- similar to commercially
18    available pad made by Ampad.
19 Q. Okay. And did you consider those Ampad pads, five or
20    six of them, in coming to your conclusions in this
21    report?
22        MR. SCOTT: Objection. Asked and answered.
23 A. I don't believe so, no, not in the conclusion, no.
24 Q. So you didn't consider the degree of variation that you
25    saw among the six, for example?

Page 136

1  A.
2         MR. CUNNINGHAM: Objection.
3  A. I didn't consider the degree of variation, I saw among
4     the six anymore than I already knew from the history of
5     my life in looking at graph paper and being around it
6     and using it, just confirmed what I already knew. I
7     mean, I relied on my life's knowledge.
8  Q. And is it your testimony that pieces of graph paper
9     from different pads cannot possibly have the same lines
10    vis-a-vis the edges of the paper?
11 A. Of course I didn't say that.
12 Q. Okay. Is it your testimony that they probably don't
13    have the same tolerances to the edge?
14        MR. CUNNINGHAM: Objection.
15 A. What was the question, they don't have the same
16    tolerances?
17 Q. Yeah.
18 A. My answer is I have no idea what the tolerances are.
19 Q. Right. But you just said a minute ago that you had a
20    group of five or six Ampad pads and you looked at them
21    and you relied on your life experience, all right, and
22    my question is, is it your testimony that different
23    pads could not have pieces of paper in them that match
24    up?
25 A. That's right what you asked me and I said of course I

Page 137

1     didn't say that.
2  Q. And you are not saying that now?
3  A. Of course not.
4  Q. Okay. So you cannot testify that the various pieces of
5     graph paper that we have before us here in this case
6     are from the same pad or from a different pad, true?
7  A. Not true.
8  Q. You can testify that they are from the same pad?
9  A. I can testify to a reasonable degree of certainty based
10    on everything that I have found that they are, yes. Of
11    the ones that I noted in my report, and I said which
12    ones were from the same pad.
13 Q. Okay. And that is -- you are able to testify to that
14    to a reasonable degree of scientific certainty even
15    though you have only looked at six other Ampad pads and
16    no other manufacturer and don't know the tolerances, is
17    that a fair summary?
18        MR. CUNNINGHAM: Objection.
19 A. Right. It is not based on that, so yeah, all those are
20    true though. You didn't state the basis for my
21    conclusion, which is why all the other ones didn't
22    matter, but I agree with you.
23 Q. The graph paper lines don't matter, is that fair?
24 A. No, that's not what I said.
25 Q. The graph paper lines do matter in your conclusion that

Page 138

1  they are from the same pad?
2  A. They are a factor.
3  Q. Okay. And I'm trying to explore that. You have
4     testified that you got life experience and you
5     purchased six pads, right?
6  A. That's one of the things that I have said since I have
7     been here, that's right.
8  Q. And you did not consider that and I think you have said
9     that twice over objection of counsel at the other end
10    of the table, you did not consider that in coming to
11    your conclusion, right?
12       MR. SCOTT: Objection as to your former
13    question, sir.
14 A. I didn't say that, no. I said I did consider my life's
15    experience. I said when I saw the pads that I got, it
16    confirmed what I thought I would see and what I had
17    seen in my life, soy didn't necessarily consider that
18    to arrive at the opinions that I did.
19 Q. You consider your life experience but not the six pads,
20    do I have it correct?
21 A. To segregate the two like that is misleading. I did
22    not specifically consider the six pads, that's correct,
23    but it confirmed what I saw and what I remembered and
24    what I have seen in my life. So it had something to do
25    with it but it isn't the basis for an opinion is what

Page 139

1     I'm saying.
2  Q. And you have not measured the degree of margin of error
3     of either the graph lines or the graph lines to the
4     edges of any pads, fair?
5        MR. SCOTT: Objection. Asked and answered.
6  A. Correct.
7  Q. But nevertheless, the six pads that you bought
8     confirmed your life experience?
9        MR. SCOTT: Objection.
10       MR. McLAREN: Having not measured anything.
11 A. The six pads are exactly what I thought I would see
12    when I looked at six different pads of graph paper.
13 Q. And you have not measured them or in your life
14    experience the lines or the edges of any of the others,
15    is that fair?
16 A. That's correct, I don't think I have ever measured the
17    distance in a piece of graph paper in my life.
18 Q. Do you know how many manufacturers of graph paper there
19    are in the United States?
20 A. No.
21 Q. Do you know how many graph paper is sold in a year in
22    the United States?
23 A. No.
24 Q. In Exhibit 3, --
25 A. Refresh my memory. What is that.

Page 140

1  Q. That's your addendum report.
2  A. Do you want me to give you Q-6 back to is it is not on
3     table?
4  Q. That will be great. I will have it here.
5  Q. Exhibit 3, paragraph A2, we talked about this already
6     and you testified that you microscopicly examined the
7     edges of the paper in question here, right?
8  A. That was one of the things that I mentioned, right.
9  Q. Did you make any analysis of the graph paper or the
10    lines or the lines to the edge of the paper here in
11    question, Q-1 through Q-6, when you microscopically
12    examined?
13 A. Well, ignore -- when I answer those questions about
14    that, I will ignore Q-5 for obvious reasons because it
15    is not the same kind of paper.
16 Q. Okay.
17 A. So if that's all right, we will just --
18 Q. Sure?
19 A. I believe it is Q-5. Let me just make sure.
20 Q. I agree?
21 A. Just assume that I am not referring to that when eye
22    talk about it. So for all the other ones, yes, I did
23    look at the distance between the grid lines and the
24    edge of the paper.
25 Q. Where is that reported in your report?

Page 141

1  A. Okay. We have got it I think in three places or four
2     places. First is the addendum report, paragraph seven,
3     talks about it.
4        In the first report, paragraph 17 talks about
5     it; paragraph 18 talks about it; so I think those
6     three. I thought there might have been one more that I
7     didn't see that I did earlier.
8  Q. Okay?
9  A. Paragraph eight in the addendum. Sorry. I skipped
10    over that one.
11 Q. All right. Let's start with the first report first.
12    Paragraph 17. First point out to me where your
13    measurements are reported in paragraph 17. I don't see
14    any measurements?
15 A. I never said that there were. That wasn't the question
16    you asked me.
17 Q. The question I asked you was where in your report did
18    you report measuring with the microscopic examination?
19       MR. CUNNINGHAM: Objection.
20       MR. McLAREN: The edges of --
21 A. Maybe we should have her read it back. I didn't answer
22    the right question then. Could you read back the one
23    that was pending before that I was looking at, please.
24 Q. That's all right. I will restate it.
25       Did you in the course of doing the microscopic

36 (Pages 138 to 141)

Page 142

1  examination that you described, measure the edges, the
2  graph paper lines to the edges of Q-1 through Q-6.
3  A. No, I have answered that several times. I have never
4  done it in my life, I don't think, is what I said,
5  including this case.
6  Q. Okay. So now turning to paragraph 17, you say that in
7  paragraph 17, you compared the graph lines, is that
8  what you are focusing on, fourth line down, can be
9  easily seen by comparing the graph lines?
10 A. Correct.
11 Q. Okay. Is that what you were referring to before?
12 A. Yes.
13 Q. Did you compare the graph lines?
14 A. Yes.
15 Q. Did you compare them to any control, anything other
16    than Q-1 to Q-6?
17 A. In that specific paragraph?
18 Q. Anywhere.
19 A. Well, yes, there is four different paragraphs that talk
20    about what was compared to what.
21 Q. Okay. My question is, in any of the reports, did you
22    compare the graph lines of any of the Q-1 through Q-6
23    documents to a control document, something other than
24    Q-1 through Q-6? Any pad from any manufacturer.
25 A. I don't think so, no.

Page 143

1  Q. Okay. So you compared the graph lines from the graph
2     paper among themselves, is that fair?
3  A. What's your question, relative to paragraph 17 or
4     relative to the two reports?
5  Q. Well, I'm looking at paragraph 17 because you pointed
6     it to me, but my question is, broadly, you compared the
7     Q-1 through Q-6 graph lines to each other but not to
8     any control, fair?
9  A. That's a two part question. The first part, Q-1
10    through Q-6 was compared to each other but not
11    exclusively and only that one to each other. Part two,
12    I did not compare it it to a control, as I said
13    earlier.
14 Q. And you did not measure?
15 A. I never measured anything. I don't know how much more
16    clear I can be.
17 Q. Okay. All right.
18 A. Relating to graph paper, I have never measured
19    anything.
20 Q. Right. You said paragraph 18. And there you say
21    spacially lined up with the graph paper lines which
22    again shows that Q-1 was fixed -- and this time you say
23    near perfect alignment, all right. When you say
24    spacially lined up with the graph paper lines, same
25    question, did you compare Q-1 for these common

Page 144

1  impressions to any graph paper other than Q-1 through
2  Q-6?
3  A. First thing, you misquoted the report, it says Q-2 was
4  fixed in near perfect line alignment, not Q-1, as you
5  said. Second of all, I compared Q-1 to Q-2, as it says
6  there. I don't believe I compared either one of them
7  to any document other than Q-1 through Q-6, as I said
8  earlier.
9  Q. Now paragraph 19, you talk about the blade marks. Do
10    you see that?
11 A. Of the first report?
12 Q. Yes. Next paragraph down?
13 A. Yes.
14 Q. Did you compare the blade marks of Q-1 through Q-6 to
15    any cuts of any edges of any graph paper other than Q-1
16    to Q-6?
17 A. No.
18    MR. SCOTT: With respect to his initial
19 report?
20    MR. McLAREN: Or any report.
21    THE WITNESS: No.
22 Q. (By Mr. McLaren): Is it your testimony that the blade
23    marks on Q-1 through Q-6 are unique?
24    MR. CUNNINGHAM: Objection.
25    MR. McLAREN: Basis.

Page 145

1     MR. CUNNINGHAM: You are including Q-5 in
2  that. And I believe he testified that he would rather
3  keep that out.
4     MR. McLAREN: Yes. We have been doing that
5  all along, but I should rephrase. I will.
6  Q. (By Mr. McLaren): Mr. Speckin, are you testifying
7     that Q-1 through Q-6 with the exception of Q-5 are
8     unique with regard to their blade marks?
9  A.
10    MR. CURTIN: Objection. Vague.
11 A. What do you mean, unique?
12 Q. Well, you say that they have blade marks and you say
13    they are likely the result of the manufacturing process
14    and I'm asking you whether or not you know whether or
15    not there are other individual sheets of paper that
16    have the same blade marks?
17 A. I don't know of any other than the ones I mentioned
18    that had the same ones.
19 Q. Do you know that there are not any others?
20 A. In the world?
21 Q. Yes.
22 A. I have no idea.
23 Q. And that's because you don't know how often a blade is
24    used to cut how many sheets of paper, we established
25    that before?

37 (Pages 142 to 145)

Page 146

1  A. That's a two part question again. We did establish
2     that before, but no, that's not why I don't know.
3  Q. All right. Why don't you know whether or not there
4     were other pieces of paper in the world that have the
5     same blade marks?
6  A. Well, if the blade is a rotary blade that cuts down the
7     paper, it is not going to be the same on -- even if
8     that same blade cut ten million sheets, it is not going
9     to have the same marks and same nicks because the
10    imperfections in the blade are not going to hit at
11    exactly the same place down the page, so it doesn't
12    mean there is going to be multiple ones that are the
13    same. At this point in time, I can't establish the
14    uniqueness of what those blade marks are. Also, I have
15    to consider that there is four sides to the paper so
16    based on all four sides, it may very well be unique
17    that no other document in the world from any pad would
18    have the same blade marks. It is possible. But I
19    don't know the answer as I sit hereed to.
20 Q. Well, if it is -- first if it is a circular blade as
21    you hype op size, it is going to turn a full
22    revolution, you know, within some space of time,
23    correct?
24 A. Is that answer really obvious that it is yes? I think
25    it is. Of course it will.

Page 147

1  Q. Sure. So when it comes around full circle, then that
2     next pad is going to have the same blade marks as the
3     pad that was cut by that segment of the circle, one
4     revolution before, right?
5  A. Not necessarily in the same place though, no, there
6     won't.
7  Q. Do you know how paper is manufactured?
8  A. I know there are several different ways it can be
9     manufactured.
10 Q. And do you know how graph paper is printed?
11 A. I said no.
12 Q. Okay. Do you know how it is cut?
13 A. No.
14 Q. Do you know if it uses a circular blade?
15 A. No.
16 Q. Okay. If it is a not a circular blade but a straight
17    blade, how many millions of sheets of paper could have
18    exactly the same blade marks, do you know?
19 A. Again, I don't know.
20 Q. Okay. And you don't know whether the exact same blade
21    marks might be on pieces of paper that came from a pad
22    and also on pieces of paper that were packaged as a
23    ream, correct?
24 A. I don't know, right.
25 Q. Okay. At the end of your first report, Mr. Speckin,

Page 148

1     you sign it Erich J Speckin, forensic document analyst.
2     Do you see that?
3  A. Yes.
4  Q. Did I read it correctly?
5  A. Yes.
6  Q. And let me start with this. Did a college award that
7     title?
8  A. No.
9  Q. Did a university award that title?
10 A. No.
11 Q. Have you passed the board of forensic document
12    examination examiners examination?
13 A. No.
14 Q. So you are not board certified by the board of forensic
15    document examiners?
16 A. That's correct.
17 Q. And have you passed the examination given by the
18    national association of document examiners?
19 A. No.
20 Q. So you are not certified by the national association of
21    document examiners, correct?
22 A. That's right.
23 Q. Okay. So if this forensic document analyst title
24    doesn't come from a college or a university or the
25    board of forensic document examiners or the national

Page 149

1     association of document examiners, from whence does it
2     come?
3  A. What does whence mean?
4  Q. Where did you get the title?
5  A. From my father.
6  Q. Okay. You on the front page say that you have
7     completed three years of training in two renowned
8     forensic libraries -- laboraties in the field. Did I
9     read that correctly?
10 A. Yes.
11 Q. And one of those is your father's?
12 A. That's correct.
13 Q. You also say I have a degree in chemistry from Michigan
14    State University, did I read that correctly?
15 A. Yes.
16 Q. What kind of a degree?
17 A. Bachelor of arts degree.
18 Q. Not a bachelor of science?
19 A. That's right.
20 Q. And you have used that sentence before, correct, Mr.
21    Speckin, the sentence quote I have a degree in
22    chemistry from Michigan State University, end quote?
23 A. Of course.
24 Q. And a judge has opined that it is quote misleading,
25    true?

38 (Pages 146 to 149)

## Page 158

1  yourself, for example?
2  A. That's it. That's all I was told, the court of final
3  -- all I was told about it.
4  Q. Okay. Well, there are other quotes about you in this
5  document, but if you have not heard of this -- of what
6  contents are, there is no point in reading it.
7  A. Same answer for all these. I have never seen this
8  document, I have never even heard about it, I just knew
9  that the court of final appeal made a decision in 05,
10  but I have never seen it.
11  Q. How about the decision by Yam judge, have you ever seen
12  that in writing?
13  A. Yes, many times.
14  Q. And are you aware that he found that you had
15  exaggerated your credentials?
16  A. I think that was one of the things in there, Yes.
17  Q. And are you aware that he found that your credentials
18  that you stated your credentials in a way that was
19  misleading?
20  A. I don't -- something to that effect. I don't recall
21  exactly what he said every heir paragraph, but
22  something like that.
23  Q. Let's take a break for ten minutes while I find my
24  copy. That way I can direct you right to the quotes.
25  VIDEOGRAPHER: This completes tape and disk

## Page 159

1  two. We will go off the record at 2:44.
2  (Whereupon a break was taken .
3  From
4  VIDEOGRAPHER: We are back on the record at
5  3:01. This is tape and disk three of the deposition of
6  Erich Speckin. Please proceed.
7  Q. (By Mr. McLaren): Mr. Speckin, would you take the
8  Westlaw document and what exhibit is that, please?
9  A. 11.
10  Q. Okay. Would you turn to page 198 at the top right hand
11  corner. A quarter of the way down on left hand column,
12  paragraph 29.3, under forensic training, E J S gave the
13  following description. Do you agree that E J S is you,
14  Mr. Speckin?
15  A. Yes.
16  Q. You gave the description quote two year residency with
17  Leonard A Speckin, his father, in the examination of
18  questioned documents and one year residency with
19  Brunell forensics laboratories in the identification
20  and dating of inks, end quote. Did I read that
21  correctly?
22  A. You read it correctly, yes.
23  Q. And then the judge Yam goes on to say 29.4, his alleged
24  residency with his father as he admitted has no bearing
25  to this case. Did I read that correctly?

## Page 160

1  A. Right.
2  Q. His a lend residency where Mr. Brunell lasted about 50
3  days only over a period of one year etcetera, etcetera.
4  Did I read that correctly?
5  MR. SCOTT: No, you did not.
6  MR. McLAREN: What did I read wrong.
7  MR. SCOTT: Where does it say etcetera
8  etcetera.
9  MR. McLAREN: I clipped the paragraph because
10  it is so long.
11  MR. SCOTT: No, if you want to take an
12  improper approach by reading portions of a portion of a
13  decision for the record, then to do it correctly.
14  MR. McLAREN: Your objection is noted.
15  MR. McLAREN: I will do it again, Mr. --
16  MR. SCOTT: You are asking if it is correct
17  and we are answering it no. You just want to read it,
18  go ahead and read it, don't ask us it it is correct and
19  be concerned that we are telling you that it is not
20  correct.
21  MR. McLAREN: Would you like to be sworn under
22  oath?
23  Q. (By Mr. McLaren): Mr. Speckin, 29.4 says in part his
24  alleged residency with his father as he admitted has no
25  bearing on this case, his alleged residence dean see

## Page 161

1  with Mr. Brew Mel lasted about 50 days only over a
2  period of one year, and then goes on from there,
3  correct?
4  A. Yes.
5  Q. Turning to the bottom of 198 in the right hand column,
6  29.7, do you have it?
7  A. Yes.
8  Q. It says in part it is doubtless that E J S acquired
9  some learning in his association with his father and
10  Mr. Brunell but given the absence of any formal
11  curriculum and again given his penchant for
12  exaggeration, this court cannot really draw any
13  conclusions as to the extent of his knowledge. Period.
14  And it goes on from there. Did I read that correctly?
15  A. Yes.
16  Q. The top of page 29.-- I'm sorry, page 199, paragraph
17  29.8, judge Yam says that you attempted to magnify your
18  experience by claiming to have examined over 100,000
19  documents. Is that true?
20  A. No. Oh, weighs your question, is it true or does it
21  say that?
22  Q. Well, does it say that?
23  A. Yes.
24  Q. Is it true that you claim to have examined over 100
25  thousand documents in that case?

# Appendix

# A

SCHWID0283

**Speckin Forensic Laboratories**
2105 UNIVERSITY PARK DRIVE, SUITE A
OKEMOS, MICHIGAN 48864
517-349-3528 • FAX 517-349-5538

LEONARD A. SPECKIN
FORENSIC DOCUMENT CONSULTANT

RICHARD L. BRUNELLE
INK DATING CONSULTANT

ROBERT D. KULLMAN
FORENSIC DOCUMENT ANALYST

JAY A. SIEGEL Ph.D.
ANALYTICAL CHEMIST

JOHN G. FUNKHOUSER Ph.D.
ANALYTICAL CHEMIST

MICHAEL J. SINKE
LATENT PRINT/FORENSIC DOCUMENT ANALYST
CRIME SCENE RECONSTRUCTIONIST

DAVID G. TOWNSHEND M.S.
FORENSIC FIREARMS EXAMINER

LAURENCE R. SIMSON M.D.
FORENSIC PATHOLOGIST

ROGER J. BOLHOUSE MBA
FORENSIC ANALYST & CONSULTANT
CRIME SCENE RECONSTRUCTIONIST
LABORATORY DIRECTOR

ERICH J. SPECKIN
FORENSIC DOCUMENT ANALYST
INK DATING SPECIALIST

THOMAS K. HUARD Ph.D.
DNA ANALYST

MARCO A. SCARPETTA Ph.D.
DNA ANALYST

PAUL B. ALBEE Ph.D.
COMPUTER RECOVERY SPECIALIST

DONALD A. SMITH
COMPUTER RECOVERY CONSULTANT

# Erich J. Speckin
August 7, 2006

Education:

-Purdue University at age 15 to study engineering

-Albion College at age 17 to study biology and pre-medical

-Michigan State University graduated with a degree in Chemistry

Forensic Training:

-Two year residency with Leonard A. Speckin in the examination of questioned documents

-One year residency with Brunelle Forensic Laboratories in the identification and dating of inks

Over 10 scientific papers authored or co-authored including:

-The Obverse-Reverse Intersection of Lines

-Chemical Removal of Magic Marker on Photocopied Documents

-An Independent Assessment of Ink Age determination by a Private Examiner

-The Detection of Mastic on Plastic

-Interpretation of Ink Age Testing Using Rate and Percent of Extraction

-Case Study of Accelerated Ink Age Determination

**SCHWID0284**

Speckin Resume'
Page 2

Invited Speaker:

    -Michigan State University

    -American Trial Lawyers Association

    -International Association of Questioned Document Examiners

    -Medical Legal Consultants

    -National Association of Document Examiners

    -Canadian Society of Forensic Sciences

    -American Academy of Forensic Sciences

    -American Society of Questioned Document Examiners

    -Midwestern Association of Forensic Scientists

    -Southwestern Association of Forensic Document Examiners

    -Medical Defense Attorneys Meetings

    -Wayne County Nursing Consultants

    -Various Insurance and Private Investigators Associations

    -Nevada State Bar Association

    -Gesellschaft fur Forensische Schriftuntersuchung E.V. (GFS) in Hamburg, Germany

Testified in cases in Federal Court, Circuit Court, District Court, Union Arbitrations, licensing matters, depositions, and the State Board of Canvassers in Michigan, Pennsylvania, Delaware, Missouri, Georgia, Louisiana, North Carolina, Oregon, New York, Illinois, Indiana, Ohio, New Jersey, Oklahoma, California, Kansas, Washington D.C., Virginia, West Virginia, South Carolina, Florida, Arizona and Washington. Also in Vancouver, British Columbia Supreme Court, Mexico, and Hong Kong.

I have been appointed by judges in Michigan, California, Maine, Florida and Australia to perform examinations at the request of the court.

SCHWID0285

Speckin Resume'
Page 3

I have also been retained by the Embassy of Uruguay, Florida Department of Law Enforcement, Michigan Attorney Generals Office, Department of Natural Resources, The State Board of Canvassers, Health Care Fraud Division, Federal Defenders Office, National Labor Relations Board as well as many local, county, state, and federal offices.

Other clients include General Motors, Ford Motor Company, Chrysler, Honda, NationsBank, National Collegiate Athletic Association, National Basketball Association, National Hockey League Players Association, as well as many others.

I have performed examinations in over 1500 cases and presented sworn testimony in several states on several levels over 100 times; also worked cases from four continents and many countries.

National Media Appearances including:

- Wall Street Journal (front page)

- America's Most Wanted

- The Learning Channel (Medical Detectives)

Professional Memberships:

-Society of Forensic Ink Analysts (Board of Directors & President)

-Midwestern Association of Forensic Sciences

-American Society of Testing and Materials

Peer reviewed scientific publications including:

- Technical Report with Case Studies on the Accelerated Aging of Writing Inks, 1998 International Journal of Forensic Document Examination,

- Chapter in Encyclopedia of Crime & Punishment, 2001 Textbook

- Impression by Traced Forgery, 2001 American Society of Questioned Document Examiners (co-author)

SCHWID0286